## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## * DIVISION


**WENDY ELROD,**

      **Plaintiff,**

**vs.**                                        **Case No. 4:08cv352-RH/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/


### REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).[1]   The decision of the

Commissioner should be reversed and Plaintiff's applications for benefits be granted.

_____

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at http://www.pdrhealth.com/drugs/drugs-index.aspx. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link).  Social Security Rulings can be found at: http://www.ssa.gov/OP_Home/rulings/rulfind1.html.

**Procedural status of the case**

Plaintiff, Wendy Elrod, applied for disability insurance benefits and supplemental security income benefits.  Plaintiff was nearly 38 years old at the time of the second administrative hearing (on September 17, 2007), has a 12th grade education, and has past relevant work as a furniture sales person, laundry tagger, order clerk, bank teller, cashier, demonstrator, office clerk, and sales clerk.  Plaintiff alleges disability due to fibromyalgia, degenerative joint disease, scoliosis,[2] and depression.  She alleges that her disability commenced on March 12, 1999.  The Administrative Law Judge found that Plaintiff has the residual functional capacity to do light work, with some restrictions.  He found that she could return to her past relevant work as a furniture sales person, laundry tagger, bank teller, cashier, demonstrator, or office clerk.

Plaintiff contends that the ALJ committed error in failing to discuss the deposition opinion of Dr. Hudson, Plaintiff's treating physician.  Doc. 16, p. 13.  Defendant concedes error in failing to evaluate the opinion of the treating physician, but urges that the error was harmless.  Doc. 19, p. 6.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

---

[2] Scoliosis is an appreciable lateral deviation in the normally straight vertical line of the spine.  DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS.

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

     The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Medical evidence**[3]

On February 26, 1999, Elrod was admitted to the Sumter Regional Hospital after she was involved in an accident with complaints of neck pain and a headache. (R. 305).  Elrod saw Steven W. Pruett, M.D. for an examination of her cervical spine, which was normal except for some mild straightening which might have been due to position or spasm. (R. 303).  On March 5, 1999, Elrod was evaluated at the Collins Clinic, complaining of pain in her right shoulder and down her right arm, limited use of her right arm, and tightness and a spasm in the trapezius muscle. (R. 403).  On March 23, 1999, Elrod was evaluated by Marc S. Goldman, M.D. (R. 318, 319).  Dr. Goldman diagnosed Elrod with mechanical neck pain, mechanical low back pain, and right upper extremity pain. (R. 319).  Cervical and lumbar spine MRI examinations were within normal limits, as was EMG testing of the right upper extremity. (R. 307-08, 310, 315).  Throughout 1999, Elrod continued to complain of pain in the neck radiating into the right arm, back muscle spasms, numbness of the right arm and right leg, and right knee pain. (R. 312, 315, 359, 401-03).  She also reported that Lortab caused nausea and Soma was not effective. (R. 403).  Elrod also had trouble opening her mouth and had pain in the right side of her jaw, and was unable to take her pills orally. (R. 403).  A note dated July 13, 1999 from the Collins Clinic stated that Elrod "is disabled to work at this time. I estimate it will be at least six months before she is able to return to work." (R. 401).

On August 3, 1999, James Smith, Jr., M.D. first examined Elrod and noted that she had a lot of joint laxity; he later opined that Elrod had fibromyalgia. (R. 357-59). On August 11, 1999, Elrod was seen by Garland K. Gudger, M.D. (R. 322-324).  Elrod's range of motion of her neck was markedly decreased secondary to pain and stiffness. (R. 322).  Elrod was also tender to palpation throughout the cervicothoracic and lumbar spine, over the AC joint, and over the bicipital tendon of the right shoulder. (R. 323).  On examination of the lumbar spine, Elrod was noted to have a limited range of motion. (R. 323).  Elrod reported that she experiences giving

---

[3] Defendant has not objected to Plaintiff's general summary of the medical evidence. Doc. 19.  Consequently, I have adopted Plaintiff's summary verbatim.  The line spacing and font have been altered to show that this is quoted from Plaintiff's memorandum. However, I have set forth and discussed the testimony of Dr. Hudson in his deposition in detail in the legal analysis section of this report and recommendation.

way of both lower extremities. (R. 323).   An X-ray of the lumbar spine revealed 12 degrees of
scoliosis at L-2. (R. 323).   Elrod was diagnosed with cervical spine pain with possible
radiculopathy, lumbar spine pain with lumbar radiculopathy, right shoulder pain with probable
bicipital tendinitis, and right knee pain. (R. 323).   On December 2, 1999, Elrod was examined by
Jamie Vivas, M.D. for evaluation of joint symptoms and noted myalgia and arthralgia with an
otherwise normal physical examination. (R. 352).   On December 20, 1999, Dr. Smith noted that
Elrod suffered from a generalized fibromyalgia-like problem. (R. 357).

On January 24, 2000, Elrod began treatment at the Roosevelt Warm Springs Institute for
Rehabilitation. (R. 349).   On physical examination, Elrod's range of motion in her cervical spine
was 45 degrees on the left and "catches." (R. 347).   On January 26, 2000, Elrod returned to the
Roosevelt Warm Springs Institute for Rehabilitation complaining of hip and lower back pain and
stated that her right shoulder seemed to be "locking up." (R. 345).   Upon examination, Elrod was
tender to palpation on her shoulder and right knee and was given a therapeutic exercise program
with stretching and biking. (R. 344-45).   On February 24, 2000, Elrod was tested in her strength
in lifting and progressed from 5 pounds to 7½ pounds lifting from floor to chest height before
feeling a strain in her back, which was less weight than she was able to lift previously. (R. 335).

On May 8, 2000, Dr. Smith noted that Elrod continued to have pain and that her clerical
work was fatiguing. (R. 355). On June 19, 2000, Dr. Smith reported that Elrod also had
emotional problems due to her fibromyalgia, divorce and children. (R. 355).   Elrod was treated
by Mark Hudson, D.O., from September 7, 2000 through March 15, 2001. (R. 384-392).   On
September 7, 2000 and March 15, 2001 Elrod reported that she felt "rotten." (R. 385, 392).   At
the last appointment, Dr. Hudson noted that Elrod had been diagnosed with fibromyalgia and
that he had seen Elrod for several months without any real improvement despite trying to place
her on an effective antidepressant and control her pain and symptoms with Xanax for anxiety,
Neurontin for pain, and Effexor for depression. (R. 385-86).   Elrod's anxiety was noted to be
worsening with an almost agoraphobic like behavior when she enters a car. (R. 385).   Dr.
Hudson reported that Elrod had not achieved a great deal of success with her antidepressant
medicine, and had been on trials of Celexa, Prozac, Paxil and Effexor although most had been
stopped prior to therapeutic dosage. (R. 385).   On physical examination Elrod was tender to
palpation everywhere and was noted to have an antalgic gait with a limp secondary to back pain.

(R. 386).  Dr. Hudson diagnosed Elrod with fibromyalgia, depression and polymyalgia. (R. 386).
On October 26, 2000, a non-examining State agency physician completed a physical residual
functional capacity assessment, opining that Elrod could perform light work. (R. 373-380).

On February 27, 2001, Elrod was evaluated by psychiatrist Henry A. Eugenio, M.D. at
the Family Life Center at Dr. Hudson's request. (R. 381).  On examination, Elrod appeared
depressed, sad and pitiful and her psychomotor activity was slow. (R. 381-82).  She was also
somewhat preoccupied with problems. (R. 382).  Dr. Eugenio diagnosed Elrod  with adjustment
disorder with mixed emotions, dysthymic disorder, personality disorder, and fibromyalgia. (R.
383).

On June 11, 2001, a non-examining State agency physician completed a physical residual
functional capacity assessment, opining that Elrod could perform light work. (R. 393-400).  On
December 1, 2001, a non-examining State agency psychologist opined that there was insufficient
evidence to evaluate Elrod's mental impairments. (R. 421).  Elrod continued to seek chiropractic
treatment in January 2002 for head, neck, and back pain. (R. 435-443).

On February 13, 2002, a non-examining State agency psychologist opined that Elrod's
mental impairments were not severe. (R. 444-457).  On March 14, 2002, Elrod was admitted to
the Grady General Hospital with back pain. (R. 534-535).  She was instructed to have home rest
with no heavy lifting or strenuous activity and apply heat to her neck. (R. 535).

On April 9, 2002, Elrod was seen by Ashley Register, M.D. for a consultative
examination pursuant to her application for disability benefits. (R. 458).  Elrod complained of
rheumatoid arthritis and fibromyalgia. (R. 458).  Elrod stated that she did not think she was
obtaining the pain relief she needed, as was taking natural herbs for her pain as a result. (R. 458).
Elrod reported that she has trouble sleeping due to her pain, that her entire spine was painful, and
that she has a reoccurrence of problems with her right hand with numbness and difficulty with
motion and movement of the joints. (R. 458).  On examination there was pain in the cervical
spine and she was point tender lumbar to cervical spine. (R. 458).  There was also point
tenderness in the glenoid and AC joint of her right shoulder and pain with range of motion. (R.
458-459).  Elrod also had point tenderness in the right elbow and pain with range of motion in
her right hip and right knee. (R. 459).  Elrod was noted to have trigger points consistent with
fibromyalgia. (R. 459).

Elrod was evaluated by James M. Keith, M.D. on April 9, 2002. (R. 463-464).  Dr. Keith opined that Elrod suffered from mild scoliosis; X-ray examinations were otherwise normal. (R. 463-64).  On April 16, 2002, Elrod was admitted to the Grady General Hospital Emergency Department due to knee and leg pain. (R. 523-528).  On April 18, 2002, Elrod saw Bradley N. Walter, M.D. for knee pain. (R. 467).  Upon examination Elrod was acutely tender to palpation everywhere and had painful range of motion. (R. 467).

On April 30, 2002, Michael Zlatkin, M.D. evaluated Elrod. (R. 465).  An MRI of the right knee revealed small effusion, mild patellofemoral compartment chondromalacia, and a cystic area likely reflecting stress-related changes from the capsular insertion site. (R. 465).  On May 2, 2002, Dr. Walter again evaluated Elrod, noting medial joint line tenderness greater than lateral joint line tenderness and shoulder irritation with positive lateral abduction and Neer impingement signs. (R. 465-66).

On May 14, 2002, Elrod was admitted to the Grady General Hospital complaining of neck and back pain. (R. 529-530). She was tender diffusely at C2-C6 and was diagnosed with cervical strain with an otherwise normal examination. (R. 521, 529).  On May 15, 2002, Elrod visited The Rehabilitation Center and John D. Archibold Memorial Hospital after her right knee buckled and she fell. (R. 557).  Elrod also complained of cervical pain, right shoulder pain, and right knee discomfort. (R. 557).  Elrod had painful range of motion of the right knee, some right anterior tibial laxity, pain with palpation at the medial joint line, and slight lateral cracking of the patella on the right. (R. 557). In addition, her right quadriceps and hamstring were weak on manual resistance. (R. 557).

On May 16, 2002, Elrod was evaluated by Richard W. Murphy, M.D. (R. 556).  On examination, Elrod was tender to palpation of the cervical spine and had limited range of motion of the lumbar spine. (R. 556). X-ray examinations were normal. (R. 556).  On May 25, 2002, a non-examining State agency physician opined that Elrod could perform medium work. (R. 470).  A non-examining State agency psychologist again opined on September 13, 2002 that Elrod's mental impairments were not severe. (R. 477-87).  On September 17, 2002, a non-examining State agency physician opined that Elrod could perform medium work. (R. 492).

On February 26, 2003, Elrod was seen by rheumatologist Victor M. McMillan, M.D. for a consultation for her musculoskeletal symptoms. (R. 543).  On physical examination, there was

some tenderness and tender points were positive in the 18 of 18 locations tested. (R. 541).  Elrod also had diffuse spinal tenderness to palpation as well as in the soft tissues. (R. 541).  Dr. McMillan diagnosed Elrod with fibromyalgia, with a history of arthralgia and myalgia in a four quadrant and axial distribution with associated sleep disturbance, fatigue, and a supportive tender point examination, history of rheumatoid arthritis, and depression. (R. 540-541).  On February 27, 2003, Dr. McMillan's examination of her hands and wrists showed minimal hypertrophic changes at the joints with some asymmetric subchondral sclerosis. (R. 509A).  Soft tissues also showed some swelling at some of the joints. (R. 509A). X-rays of her hands and wrists revealed mild osteoarthritis. (R. 551-552).  Dr. McMillan diagnosed early mild osteoarthritis. (R. 509A).  Elrod was noted to be taking Neurontin and Paxil. (R. 542).

Elrod again sought chiropractic treatment from February 2003 through November 2003. (R. 499, 501-03).  On August 26, 2003, Elrod returned for a visit with Dr. McMillan. (R. 538-539).  Elrod reported that her energy had continued to wax and wane and that she discontinued her medications because they "stopped working." (R. 539).  On examination, Elrod was tender in the wrists, elbow and knee and her shoulder range of motion associated with pain with tender points diffusely and positive. (R. 539).  Elrod reported walking 20 minutes daily and stretching for exercise. (R. 539).  Dr. McMillan did not prescribe medications, but noted that he discussed treatment options and "realistic expectations for medications in this condition, which has been their experience." (R. 539).  On December 30, 2003, Elrod was admitted to the Capital Regional Medical Center Emergency Room for chronic back pain. (R. 574-577).

On January 15, 2004, Elrod was admitted to the Grady General Hospital Emergency Department and was diagnosed with anxiety and psychogenic cough. (R. 520).  On February 21, 2005, Elrod called Dr. McMillan stating that she had a flare up of her fibromyalgia and arthritis; she was instructed to make a follow-up appointment. (R. 582).  On March 17, 2005, Elrod presented to the Quail Ridge Family Practice. (R. 578).  She was noted to have muscle and tendon pain positive in 12 of 14 locations typical of her fibromyalgia and her cervical and thoracic spine. (R. 578).  Elrod returned on April 21, 2005 and was diagnosed with somatic dysfunction and fibromyalgia. (R. 578).  On August 5, 2005, 14 out of 14 fibromyalgia points were tender. (R. 611).  Elrod also had points not in those demarcated areas that were tender due to the maternal activities she had to undertake on a daily basis. (R. 611).  Elrod was diagnosed

with myofascial strain superimposed on chronic fibromyalgia. (R. 611).  On May 31, 2005, a non-examining State agency physician opined that Elrod could perform medium work. (R. 591).

On April 16, 2007, Paul E. Peach, M.D. examined Elrod for a disability evaluation. (R. 615).  Dr. Peach noted multiple trigger points subjectively and diagnosed a history of fibromyalgia, probable depression, and a questionable history of rheumatoid arthritis. (R. 615). Dr. Peach opined that Elrod could lift ten pounds frequently and twenty pounds occasionally, however, his notation regarding limited standing and walking was partially illegible, perhaps referring to a two hours limitation. (R. 616).  He also restricted Elrod to no highly repetitive activities with her hands. (R. 621).  On April 24, 2007, Elrod was examined by Jason E. Griffin, M.D. (R. 631-632).  Elrod complained of multiple aches and pains in her joints and hands and increasing fatigue. (R. 631). Dr. Griffin diagnosed Elrod with generalized arthralgias, questionable history of osteoarthritis, rheumatoid arthritis, fibromyalgia and depression. (R. 632).

On May 1, 2007, Elrod saw Ann L. Jacobs, Ph.D. for a psychological consultative evaluation pursuant to her application for disability benefits. (R. 622-627).  Elrod reported that she did not feel any benefit from antidepressant medicine. (R. 623).  Dr. Jacobs diagnosed Elrod with major depression, specific phobia, personality disorder, fibromyalgia, rheumatoid arthritis, migraines, and osteoarthritis. (R. 627).  Dr. Jacobs opined that Elrod had "limited but satisfactory" ability to function in several areas of mental performance, but Elrod's pain, depression and anxiety reduced her concentration and reliability. (R. 628–630).

Elrod saw Stella Von Troil, M.D. on May 21, 2007. (R. 641-642).  Elrod reported that she had been having headaches and joint pain but was not on any medication and did not tolerate medications well. (R. 641).  Dr. Von Troil diagnosed Elrod with rheumatoid arthritis. (R. 641). Elrod sought treatment at Tallahassee Memorial HealthCare on August 31, 2007, with complications due to arthritis and pain. (R. 639).  Her depression was reportedly worse and she was prescribed Cymbalta. (R. 639).  On September 5, 2007, she complained of medication problems and feeling nauseated and dizzy with severe headaches. (R. 638).

**Legal analysis**

On June 23, 2005, the Appeals Council remanded Plaintiff's application to the Administrative Law Judge.  R. 94.  Among other things, the Appeals Council found that remand was needed because the ALJ had failed to "address the opinions expressed in Exhibit 7D/21 [Dr. Hudson's deposition] as to the claimant's ability to perform work-related functions, or indicate the evidentiary weight accorded such opinion evidence, as required by 20 CFR 404.1527, and Social Security Rulings 96-2p, 96-5p, and 96-6p."  *Id.*

Dr. Hudson was deposed on January 9, 2003.  R. 148.  He is a board certified family practice physician, and at that time had been in practice for 15 years.  R. 151-152.

Dr. Hudson said that he first examined and treated Plaintiff on February 7, 2000.  R. 153.  Dr. Hudson said that Plaintiff had had a motor vehicle accident earlier that year, and had been diagnosed with fibromyalgia as a result of that injury.  R. 154.  Dr. Hudson found from Plaintiff's medical records and her reports that she "had had significant problems with painful joints and muscle spasticity for a period of time."  *Id.*  She was taking "an antidepressant, Effexor, Elvavil at bedtime, and she was taking an anti-inflammatory, Vioxx, at that time."  *Id.*  She said that she "just felt rotten when she came in."  Dr. Hudson examined Plaintiff and he found that she was tender to palpation, had quite a bit of edema in her lower extremities, and was tender throughout range of motion testing.  R. 156.  Dr. Hudson said that he "continued the diagnosis of fibromyalgia because it was our first visit and I had no reason to doubt the fact that fibromyalgia was certainly a predominant portion of that."  *Id.*  He thought that "there is a

significant concomitant problem with depression that goes with this when someone feels that bad for that long."  *Id.*

On the second visit, on October 2, 2000, Dr. Hudson wondered if "this was an inflammatory process or whether this was truly fibromyalgia," and noted Plaintiff's sedimentation rate was 15 (normal is 20), and he said "it certainly doesn't infer that she would have some inflammatory process, like rheumatoid arthritis in a flare or some other synovial reaction to that."  R. 157.  He said: "I think a lot of us could walk around with a 15 right now."  R. 157-158.  He said that he then became concerned, as discussed above, that Plaintiff suffered from reflex sympathetic dystrophy because Plaintiff had pain complaints about specific areas as being more predominant, "as compared to that diffuse pattern that goes along with the fibromyalgia."  R. 158.  He described reflex sympathetic dystrophy as "real pain" and edema continuing long after one would expect healing from a traumatic injury.  *Id.*  He described this as like the pain sometimes felt after an amputation has occurred, said that the symptoms can occur after trauma from an automobile accident, and often recur with pain after a period of healing and having no pain.  R. 159-160.

Dr. Hudson saw Plaintiff again in November and December, 2000.  R. 161-162. At the December visit, she was no longer having severe pain in her thumbs, but "was having difficulty getting up and just moving about, getting out of bed and getting to the office [presumably Dr. Hudson's office], and taking care of . . . her son, was difficult."  R. 162.  She reported to Dr. Hudson:

> She wrote notes that she tried to do a few things, and basically those
> notes talk about everything hurts.  Her knee hurts.  It was cramping and
> popping.  Her right hip hurts.  She had pain that radiated from her neck to

her right shoulder and her arm.  Her hand still hurt when she tried to write
or do any cross-stitching.  She tried to get on a bicycle just to get some
exercise, and her right hip and her low back hurt.  She has to go to the
bathroom all the time.

R. 162.  Plaintiff told Dr. Hudson that she was not interested in interpersonal

relationships.  R. 163.  Dr. Hudson said that her "actions there were consistent with her

injury."  *Id.*

Dr. Hudson saw Plaintiff again on March 15, 2000, and "her chief complaint was

that she just felt rotten."  *Id.*  Further along in the deposition, Dr. Hudson said:

The depression because she hasn't worked and the fibromyalgia have
worked hand in hand with one another and they are almost inseparable in
their abilities to get her better, because until you get her depression better,
I don't think you're going to get her fibromyalgia better, and vice versa.

R. 166.  He said:

When you have pain that lasts every day and it bothers you to that degree,
it's tough to control depression.  When you are depressed and you're
injured and you're trying to get through that portion of it, it's hard to get up
and do all the things you're supposed to do to try and get better from your
fibromyalgia.

R. 185-186.  He said that Plaintiff "rides a roller coaster," and sometimes

"she appears as though she has made significant strides and then a short period of time

later, it is worse."  R. 192.  He said that this swing in symptoms was also a hallmark of

untreated depression.  R. 193.  Dr. Hudson said that he:

would agree that she does not have an acute injury that I can attribute to
any known insult that may have occurred in the recent past.  Her illness is
related to the fibromyalgia and the concomitant depression.

R. 182.

Dr. Hudson again explained that due to the sedimentation rate, although the

diagnosis of rheumatoid arthritis had been made several times in the medical records,

he could not confirm that diagnosis.  R. 167.

Dr. Hudson said that Plaintiff "would take a medication until she felt it was no

longer effective for her and then she would present back to the office for care, having

stopped that medication before she came back to see me . . . ."  R. 179.  He said that

"[t]here are issues of compliance that are present.  Some of that that she has expressed

to me is because she can't pay for the medications to continue . . . ."  R. 180.  He said

that a week's trial is "probably not long enough to make a good therapeutic trial of

medication."  R. 181.  "So, yes, she has been less than compliant with all the

medications I've given her."  *Id*.

Dr. Hudson was asked whether he thought Plaintiff was able to work.  He said:

> No, I don't think so.  The roller coaster effect that she's had with the pain
> in various joints, as well as the depression that's gone with this, has made
> it impossible.  She has difficult taking care of her child on a regular basis.
> No, I don't think at present that she's capable of maintaining employment
> at this time because of the inability to know on a daily basis whether or not
> she is going to be able to get out of bed and go to work.

R. 168-169.  He was asked about Plaintiff's ability to take care of her child, and he said

that having a child in the home is stressful:

> When you add an ill parent, when you add a parent who has difficulty
> getting out of bed and brushing her teeth and brushing her hair, it takes
> some of the pleasure, the anhedonia, and removes it completely because
> she can't go out and play with her child, she can't do things that she wants
> to do.  He has to crawl up in her lap instead of going over and picking him
> up when she wants to.

R. 169.  Dr. Hudson said that he knew of people who had fibromyalgia who were able to

continue to work "with an understanding employer."  R. 189.  He said that Plaintiff fit the

category of patients with fibromyalgia who cannot work.  *Id*.

The ALJ did not discuss the deposition testimony of Dr. Hudson.  R. 18-32.

Defendant concedes error in failure to evaluate Dr. Hudson's opinions.  Doc. 19, p. 6.

Defendant agrees that Dr. Hudson had a treating relationship with Plaintiff, and

therefore was a treating physician.  *Id*.

The opinion of a claimant's treating physician must be accorded considerable

weight by the Commissioner unless good cause is shown to the contrary.  Lewis v.

Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians:

> are likely to be the medical professionals most able to provide a detailed,
> longitudinal picture of your medical impairment(s) and may bring a unique
> perspective to the medical evidence that cannot be obtained from the
> objective medical findings alone or from reports of individual examinations,
> such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).  The reasons for giving little weight to the opinion of a

treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957

F.2d 837, 841 (11th Cir. 1992), and clearly articulated.  Phillips v. Barnhart, 357 F.3d at

1241.  "Where the Secretary has ignored or failed properly to refute a treating

physician's testimony, we hold as a matter of law that he has accepted it as true."

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

Defendant argues that the failure of the ALJ to mention and evaluate the opinion

of Dr. Hudson contained in his deposition was harmless error given other evidence in

the record.  Doc. 19, pp. 6-9.  Certainly the doctrine of harmless error should be

employed if at all possible.  But the doctrine of harmless error cannot provide reasons

for agency action which the agency itself has never articulated.  On administrative

review of an action of an agency of the Executive Branch, this court may not "substitute

counsel's *post hoc* rationale for the reasoning supplied by the" agency itself.  N.L.R.B. v.

Kentucky River Community Care, Inc., 532 U.S. 706, 715 n.1, 121 S.Ct. 1861, 1868 n.1,

149 L.Ed.2d 939 (2001), *quoting*, N.L.R.B. v. Yeshiva Univ., 444 U.S. 672, 685, n. 22,

100 S.Ct. 856, 63 L.Ed.2d 115 (1980) (citing Securities and Exchange Commission v.

Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)[4]); Real v.

Simon, 514 F.2d 738, 739 (5th Cir. 1975) (denying rehearing of Real v. Simon, 510 F.2d

557 (5th Cir. 1975)); Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003);

Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001).  However,

> While we may not supply a reasoned basis for the agency's action that the
> agency itself has not given [citing Chenery Corp.], we will uphold a
> decision of less than ideal clarity if the agency's path may reasonably be
> discerned.

Manasota-88, Inc. v. Thomas, 799 F.2d 687, 691 (11th Cir. 1986).

A remand for the ALJ to properly evaluate Dr. Hudson's opinion is not available

here.  In this Circuit, this court must accept Dr. Hudson's opinion "as true" because the

---

[4] Chenery Corp. held:

> When the case was first here, we emphasized a simple but fundamental
> rule of administrative law.  That rule is to the effect that a reviewing court,
> in dealing with a determination or judgment which an administrative
> agency alone is authorized to make, must judge the propriety of such
> action solely by the grounds invoked by the agency.  If those grounds are
> inadequate or improper, the court is powerless to affirm the administrative
> action by substituting what it considers to be a more adequate or proper
> basis.  To do so would propel the court into the domain which Congress
> has set aside exclusively for the administrative agency.

Chenery Corp., 332 U.S. at 196, 67 S.Ct. at 1577.

ALJ "has *ignored* or failed properly to refute a treating physician's testimony."

MacGregor v. Bowen, 786 F.2d at 1053 (emphasis added); Elam v. Railroad Retirement

Bd., 921 F.2d 1210, 1217 (11th Cir. 1991); Critchfield v. Astrue, 2009 WL 635698 (N.D.

Fla. Mar 10, 2009) (No. 308cv32-RV/MD).  *Compare*, Harris v. Astrue, 546 F.Supp.2d

1267 (N.D. Fla. 2008) (No. 5:07cv44-RS/EMT) (remanding because the ALJ gave

improper reasons to discount the opinion of a treating physician, but did not ignore it).[5]

*But see,* Cole v. Barnhart, 436 F.Supp.2d 1239 (N.D. Ala. 2006) (finding that the

opinions of the treating physician must be accepted as true where the ALJ "did not

properly refute them.").

Application of the binding precedent in MacGregor is especially suitable in this

case.  Plaintiff filed her application for benefits on January 23, 2002.  It is now 2009.

She had an administrative hearing before an ALJ on August 17, 2004, and this resulted

in an unfavorable decision dated January 26, 2005.  R. 45-54.  On June 23, 2005, the

Appeals Council remanded for a new hearing, specifically pointing out the error of failing

to evaluate the opinion of Dr. Hudson.  R. 94-96.  The new administrative hearing did

not occur until over two years later, on September 17, 2007.  R. 689.  It is time for this

January 23, 2002, application to be resolved.  Dr. Hudson was the treating physician for

several years, and the opinions he expressed in his deposition were fully explained and

subjected to examination by two attorneys.  His medical opinion is substantially more

robust than in the usual social security case.  He expressed his opinion as to Plaintiff's

ability to work.  He expressed his opinion in a way that effectively covered the issue of

---

[5] Harris distinguished MacGregor as a case where the ALJ made no finding as to the weight of the opinion of the ALJ, *i.e.*, he *ignored* the opinion.  786 F.Supp.2d at 1282.

Plaintiff's residual functional capacity to attend to the demands of a job.  He said there are days when Plaintiff cannot even get out of bed to work.  He said that Plaintiff's condition varies like a roller coaster.  He fully believed Plaintiff's subjective descriptions of the degree of pain she suffers.

Further, the record contains medical evidence that supports a diagnosis of fibromyalgia, that is, pain in the requisite number of trigger points, and that diagnosis was substantial evidence in the record to support Dr. Hudson's opinion and diagnosis. Plaintiff was examined a number of times (from July 3, 2002, to October 7, to August 26, 2003) by Victor M. McMillan, M.D., a rheumatologist.  R. 538-553.  On February 26, 2003, Dr. McMillan found that Plaintiff had 18 positive trigger points of 18 tested, and his diagnosis was fibromyalgia.  R. 541.  "Fibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist."  Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996).[6]

> The Ninth Circuit has described fibromyalgia as a "rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue.  Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease."  *Benecke v. Barnhart*, 379 F.3d 587, 589-90 (9th Cir. 2004).

Davis v. Astrue, 287 Fed.Appx. 748, 762 (11th Cir. Jul 09, 2008) (not selected for publication in the Federal Reporter, No. 07-11648).  The signs of fibromyalgia, according to American College of Rheumatology guidelines, are primarily tender points

---

[6] The court there found that the administrative law judge had an "all pervasive misunderstanding of the disease," finding inappropriate that the ALJ criticized the claimant "for having consulted a rheumatologist rather than an orthopedist, neurologist, or psychiatrist."  78 F.3d at 307.

on the body.  Green-Younger v. Barnhart, 335 F.3d 99, 107 (2nd Cir. 2003).  The court

there said:  "Green-Younger exhibited the clinical signs and symptoms to support a

fibromyalgia diagnosis under the American College of Rheumatology (ACR) guidelines,

including primarily widespread pain in all four quadrants of the body and at least 11 of

the 18 specified tender points on the body."  Id.  A patient's subjective complaint "is an

essential diagnostic tool" for the treating physician.  Id., quoting Flanery v. Chater, 112

F.3d 346, 350 (8th Cir. 1997).  Thus, contrary to Defendant's argument, doc. 19, p. 7, it

was entirely proper for Dr. Hudson to base his opinion upon Plaintiff's subjective

complaints.

Defendant argues that had the ALJ focused upon the opinion of Dr. Hudson, he

would have rejected it in favor of the consultative opinions of Drs. Peach and Griffin.

Doc. 19, p. 8.  Dr. Peach noted "multiple trigger points subjectively," but gave that

observation no weight in reaching his opinion as to Plaintiff's residual functional

capacity.  R. 615.  Dr. Griffin's handwritten findings are nearly illegible.  R. 633.  Given

the well-explained opinion of Dr. Hudson, the treating physician, it is doubtful that

rejection of that opinion in favor of one-time examining physicians would hold up on this

court's review.[7]  But the court should not reach this issue since MacGregor is

---

[7] A consultative examination, that is, a one-time examination by a physician who is
not a treating physician, need not be given deference by the Commissioner.  McSwain
v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987).  Thus, while a residual functional
capacity assessment by a consulting physician can be substantial evidence to support a
hypothetical to a vocational expert, Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir.
2002), there is contrary authority.  Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)
("opinion of a consulting physician who examines a claimant once or not at all does not
generally constitute substantial evidence.").

dispositive.  The ALJ ignored Dr. Hudson's opinion, and this court now must accept it as true.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge did not correctly follow the law and was not based upon substantial evidence in the record.  The decision of the Commissioner to deny Plaintiff's application for benefits should be reversed and benefits awarded to the date of alleged onset.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **REVERSED** and the Commissioner **ORDERED** to grant Plaintiff's applications for benefits to the date of alleged onset.

**IN CHAMBERS** at Tallahassee, Florida, on May 22, 2009.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**



**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**